In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 17-1683 & 17-1591

FREEDOM FROM RELIGION FOUNDATION, INC., *et al.*,

*Plaintiffs-Appellees, Cross-Appellants*,

*v.*

CONCORD COMMUNITY SCHOOLS,

*Defendant-Appellant, Cross-Appellee.*

---

Appeals from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:15-CV-463 — **Jon E. DeGuilio**, *Judge.*

---

ARGUED OCTOBER 31, 2017 — DECIDED MARCH 21, 2018

---

Before WOOD, *Chief Judge*, and EASTERBROOK and SYKES, *Circuit Judges*.

WOOD, *Chief Judge*. Since ancient times, people have been celebrating the winter solstice, which occurs around the third week of December in the Northern Hemisphere. Many of these celebrations are religious in nature, and so in the modern United States they have led to a depressingly steady stream of First Amendment challenges, in which one party wishes to express its religious views in the public sphere and

the other party asserts that the Establishment Clause would be violated by the display.

Our case fits that pattern to a T. It arose in Elkhart, Indiana, which is served by the Concord Community Schools. For nearly half a century, Concord High School spread holiday cheer with a "Christmas Spectacular"—a winter concert featuring an elaborate, student-performed nativity scene. Things changed, however, when some parents, a student, and a non-profit organization objected to what they perceived to be an impermissibly religious program. The school suggested that the 2015 version of the show would reflect modest alterations to the 2014 version. After the district court preliminarily enjoined the school from putting on even the revised show in 2015 as proposed, Concord scrubbed more of the religious content from the show.

The district court agreed with the plaintiffs that the 2014 Spectacular and the version initially proposed for 2015 violated the First Amendment's Establishment Clause and awarded nominal damages. But the court sided with the school in finding the latest version of the show constitutional. Because we also find that the school's second round of adjustments to the Spectacular were enough to push it over the line for compliance with the Constitution, we affirm the judgment of the district court.

## I

### A

For decades, students at Concord High School have staged and performed the Christmas Spectacular, a holiday show featuring students' choral, instrumental, and dance performances. The students not only perform, but also handle the

design and creation of costumes, sets, and props. They spend months preparing for the annual show in their performing arts classes and extracurricular activities. Concord's production is extraordinary: it involves about 600 students and puts the lie to those who suggest that arts and music are not important parts of a high school program. While the Spectacular showcases the talents of Concord students, it also celebrates the holiday season, with a particular focus on Christmas.

In August 2015, the Freedom From Religion Foundation, Inc. ("FFRF"), a non-profit organization focused on defending the constitutional line between church and state, wrote a letter to the school's superintendent on behalf of one of FFRF's members, a parent of a Concord High School student. FFRF expressed concerns about the religious nature of the Spectacular's second half. After the superintendent found no merit in the parent's position, FFRF, along with the parent and his child, sued the school, alleging that the Christmas Spectacular violated the First Amendment's Establishment Clause. Two more parents later joined the suit. Because the school made changes to the program over the course of litigation, we describe each of the different iterations at issue.

Although the first half of the show, which featured non-religious pieces tied to an annual theme, varied from year to year, the second half did not. For 45 years (through 2014), Concord followed a consistent script, to which we refer as the "2014" show. The 30-minute second half contained a 20-minute segment called "The Story of Christmas." This section included religious songs interspersed with a narrator reading passages from the New Testament. Student actors walked across stage (as if going to Bethlehem) before posing for a nativity scene; in all, this lasted about 12 minutes.



Plaintiffs took issue with this portion of the Spectacular in their initial letter and subsequent lawsuit. That suit, filed in October 2015, asked for declaratory and injunctive relief, as well as nominal damages and attorneys' fees. With December fast approaching, the plaintiffs asked the district court for a preliminary injunction to prevent the school from performing the 2014 version of the second half in the December 2015 show. Before the court ruled on plaintiffs' motion, Concord volunteered to make two changes to the 2015 program (the "proposed" version). First, it said that it would remove the scriptural reading from the nativity scene, which otherwise would remain unchanged. Second, it added two songs to kick off the second half: "Ani Ma'amin" and "Harambee." These performances were intended to represent Hanukkah and Kwanzaa.

The district judge concluded that the proposed edits did not adequately address the Establishment Clause problems, and so on December 2, 2015, it granted a preliminary injunc-

tion forbidding the school from performing the proposed version. In response to the district court's ruling, Concord quickly edited the Spectacular further. The post-intermission segment actually performed in 2015 (the "2015" show) is, to our knowledge, the one performed in 2016 and 2017. The first half, "The Magic of the Season," continues to feature seasonal and non-religious songs and skits, such as "Winter Wonderland," "Text Me Merry Christmas," and "Secret Agent Santa." It lasts about an hour.







The second half, "The Spirit of the Season," is still about a half-hour in length and takes a more reverential tone. After announcing that the Spectacular will now "observe the many cultural celebrations during this holiday season," the show spends about four and a half minutes each explaining and performing a song to represent Hanukkah and another for Kwanzaa. Images are projected onto large screens to accompany both songs. For the remaining 20 minutes, students perform numerous Christmas songs that are more religious in nature (*e.g.*, "Jesus, Jesus, Rest Your Head," "O Holy Night"). During one of the songs, a nativity scene appears on stage for two minutes. The manger uses mannequins, not student actors. There are no New Testament readings. In February 2016, the plaintiffs amended their complaint to allege that the 2015 version was also unconstitutional.







B

In 2016, both parties moved for summary judgment. The district court ruled that the 2015 show did not violate the Establishment Clause and granted partial summary judgment in favor of Concord. After supplemental briefing on whether the plaintiffs' challenges to the 2014 and proposed versions were moot, the court decided that they were not. It granted the plaintiffs a declaratory judgment that the 2014 and proposed versions were unconstitutional and awarded $10 in nominal damages; it denied plaintiffs' request for a permanent injunction. The parties' cross-appeals from the district court's final judgment are before us.

We review a district court's decision on cross-motions for summary judgment *de novo*, evaluating the record in the light most favorable to the non-moving party on each issue. *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017). We also consider legal questions of mootness *de novo*, though we review the underlying factual determinations for clear error. *Wis. Right to Life, Inc. v. Schober*, 366 F.3d 485, 489 (7th Cir. 2004).

## II

Plaintiffs allege that Concord's alterations to the second half of the Spectacular were not enough to avoid a violation of the Establishment Clause of the First Amendment. That clause prohibits Congress from enacting any law "respecting an establishment of religion." U.S. CONST. amend. I, cl. 1. The Supreme Court has extended this protection to states and municipalities. *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 8 (1947). The Supreme Court has employed at least three ways to assess whether a local governmental body, such as a school, violates the Establishment Clause: the endorsement, coercion, and purpose tests. We recognize that commentators, like our concurring colleague, have found flaws in each of these tests,[1] but as a lower court, we must follow the guidance we have been given to the best of our ability. We therefore examine the Spectacular as performed in 2015 under each of the Court's approaches.

## A

The first approach—the endorsement test—originated in a concurrence by Justice O'Connor; it was approved by a majority of the Court a few years later. *Lynch v. Donnelly*, 465

---

[1] Indeed, there is debate among the Justices about the continuing validity of the endorsement test. Justices Scalia and Thomas, in a dissent from a denial of certiorari, expressed the view that *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014), had rejected it. See *Elmbrook Sch. Dist. v. Doe*, 134 S. Ct. 2283 (2014). The opinion in *Town of Greece*, however, did not make this explicit. Moreover, at least the dissenting Justices in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2031 n.4 (2017), suggested that the endorsement test is still with us. For now, we do not feel free to jettison that test altogether—and we note that given the outcome in this case, whether or not we use it makes little difference.

U.S. 668, 691–92 (1984) (O'Connor, J., concurring); *Cnty. of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 592–94 (1989), *abrogated on other grounds by Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014). This analytic tool looks for state action that communicates a government's endorsement of a religion or a particular religious belief. *Freedom From Religion Found., Inc. v. City of Marshfield*, 203 F.3d 487, 493 (7th Cir. 2000). Such endorsement is especially concerning when impressionable children are involved. *Doe ex rel. Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840, 851 (7th Cir. 2012) (*en banc*) ("*Elmbrook II*"). To determine whether a practice endorses religion, we must look at the totality of the circumstances surrounding the challenged conduct from the perspective of a reasonable observer. *Books v. Elkhart Cnty.*, 401 F.3d 857, 867 (7th Cir. 2005) ("*Books II*"). The reasonable observer is aware of a situation's history and context and encompasses the views of adherents and non-adherents alike. *Cnty. of Allegheny*, 492 U.S. at 620; *Books II*, 401 F.3d at 867.

It was under this standard that the district court concluded plaintiffs were likely to succeed on the merits in their initial challenge. But the 2015 production's second half differs significantly from the 2014 and proposed programs. The biblical reading is gone. The nativity scene is over 80% shorter, now on stage for just one song with a handful of mannequins rather than student actors. The show also pays tribute, albeit briefly, to two winter celebrations besides Christmas. We must ask if a reasonable observer, viewing the Spectacular as a whole, would perceive the 2015 show as a religious endorsement.

Let us first start with the most inherently religious aspect of the show: the nativity scene. We are not prepared to say

that a nativity scene in a school performance automatically constitutes an Establishment Clause violation. See *Doe v. Wilson Cnty. Sch. Sys.*, 564 F. Supp. 2d 766, 800–01 (M.D. Tenn. 2008) (finding a two-minute nativity scene in a 22-minute program acceptable because it "presented in a prudent, unbiased, and objective manner" "the traditional historical, cultural, and religious meaning of the holiday in America"). Each show must be assessed within its own context. Nevertheless, the nativity story is a core part of Christianity, and it would be silly to pretend otherwise. Many nativity scenes therefore run a serious risk of giving a reasonable viewer the impression of religious endorsement. But in Concord's 2015 show, the nativity tableau no longer stands out. Instead of serving as the centerpiece for much of the second half and the finale, it has become just another visual complement for a single song. The Supreme Court has similarly allowed a crèche that is part of a larger, mostly secular display. *Lynch*, 465 U.S. at 685–87 (1984) (upholding a nativity scene accompanied by secular objects); see also *Books II*, 401 F.3d at 868–69 (allowing a display containing the Ten Commandments and secular texts).

Another problematic feature had been the music of the show's second half. In the 2015 version, while the playlist carries over much of the earlier programs, it adds Ani Ma'amin and Harambee. We acknowledge that, although the narrative descriptions for each holiday are roughly the same length, the number of Christmas songs dwarfs the single songs to celebrate Hanukkah and Kwanzaa. Nevertheless, we accept the school's assertion that there are a greater number of appropriate Christmas arrangements by virtue of the sheer volume of Christmas songs. (This may simply reflect familiarity rather than actual numbers. Anyone listening to the radio during

December will realize that there are other familiar Hanukkah songs. *E.g.*, "Hanukkah, O Hanukkah," the "Dreidel" song. See Andrew Frisicano & Ro Samarth, *Eight Days of Hanukkah Songs to Listen to*, TIME OUT (Nov. 27, 2017), https://www.timeout.com/newyork/music/best-hanukkah-songs.)

It also gives us pause that, as the district court recognized, the songs in the second half of the program "generally align with the story of the birth of Jesus." While this is practically the only message in the second half of the 2014 show (to the point that it was hard to distinguish it from many Christmas Eve church services), the 2015 show is materially different. Without the biblical narration and live nativity, the performance of Christmas carols alone does not inevitably convey a religious message. These songs, played "with regularity" in workplaces and stores and on TVs and radios, have permeated mainstream society. See *Florey v. Sioux Falls Sch. Dist. 49-5*, 619 F.2d 1311, 1316 n.5 (8th Cir. 1980) (recognizing that "carols have achieved a cultural significance" such that they should not be *per se* prohibited from public schools).

The religious nature of the nativity and the songs do not come off as endorsement in part because they make up only a fraction of the Spectacular, which as configured in 2015 is primarily a non-religious seasonal celebration. The Santas, jingle bells, and winter wonderlands of the first half all promote the secular aspects of the holiday season. (We recognize that some may view these songs and symbols as non-secular given that Christmas is, at root, a Christian holiday; on the other hand, even the pre-Christian pagans had their winter solstice celebrations, as we have noted.) See *Cnty. of Allegheny*, 492 U.S. at 616–17 (describing Christmas trees as secular symbols of the

holiday season); *Lynch*, 465 U.S. at 711 (Brennan, J., dissenting) (characterizing Santa Claus, reindeer, and carolers as "secular figures"). Another point in favor of the 2015 show is the short length of the nativity scene. In another setting, a scene of similar length has been found unconstitutional. *E.g.*, *Lee v. Weisman*, 505 U.S. 577, 594 (1992) (holding a two-minute prayer at a graduation unlawful).

Yet the broader secular context—on top of the inclusion of two other holidays—matters here because a reasonable audience member, sitting through the 90-minute Spectacular, would not understand the production to be ratifying a religious message. See *Bauchman for Bauchman v. West High Sch.*, 132 F.3d 542, 555–56 (10th Cir. 1997) (a high school choir's performance of Christian devotional songs at churches did not constitute endorsement of religion where the choir also performed secular songs in non-religious settings); see also *Books II*, 401 F.3d at 868–69 (a display containing the Ten Commandments along with secular texts and educational explanations would not reasonably be perceived as an endorsement of religion).

The changes to the second act reduced the religious impact, tipping the scales in favor of Concord. The show's history, in particular the use of the same living nativity scene for the previous 45 years, supports this conclusion. Plaintiffs argue that a reasonable observer would view even the 2015 show, with its abbreviated nativity, as the same religious program, just with litigation-motivated edits. The counterargument is that an observer would reasonably perceive the 2015 Spectacular as a major departure from 2014. Where the second half was exclusively a telling of the birth of Jesus, it can now be seen as a collection of music from multiple traditions. The

district court adopted the latter view, and we find that a fair assessment of the evidence.

It is worth emphasizing that no one factor alone—the secular first half, the nativity's lack of prominence, the inclusion of other holidays—leads us to conclude that the 2015 Spectacular passes muster under the endorsement test. Overall, the 2015 performance in its current form would not cause a reasonable observer to believe that Concord is signing off on a particular religious message.

B

Plaintiffs also argue that the 2015 production impermissibly coerced the audience members (including some students, we presume) and student participants to conform to one particular religion—Christianity. In two school-prayer cases, the Supreme Court articulated the approach for evaluating whether a government applied coercive pressure to support or participate in religion. In *Lee v. Weisman*, 505 U.S. 577 (1992), the Court held that a two-minute prayer at a middle school graduation violated the First Amendment because it applied subtle and indirect public and peer pressure to remain silent. *Id.* at 587, 593–94. In *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000), the Court concluded that a student-initiated prayer before a high school football game forced students to make an unconstitutional choice between religious conformity or not attending games. *Id.* at 312. This court has employed the coercion test to find hosting a high school graduation in a church unconstitutional because the school created a "captive audience" in a proselytizing environment. *Elmbrook II*, 687 F.3d at 855–56. As these cases suggest, coercion concerns are heightened when the conduct at issue involves elementary and secondary

public school students. *Lee*, 505 U.S. at 592; *Edwards v. Aguillard*, 482 U.S. 578, 583–84 (1987) (acknowledging that students are particularly vulnerable because school attendance is mandatory and they are especially susceptible to pressure to emulate teachers and peers).

Concord argues that coercion analysis has no role to play here, and so it does not explain why it should prevail if we do not agree with its premise. Instead, it attempts to incorporate by reference the district court's opinion on the matter. We do not see why coercion should be off the table: this is an approach that the Supreme Court has taken, and that we have applied in the past. Because "appellate briefs may not incorporate other documents by reference," we could, if we wished, deem any opposition to plaintiffs' coercion argument as forfeited. *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 924 (7th Cir. 2012) (citation omitted). But we think it best to reach the merits, in the interest of completeness.

As in *Lee*, *Santa Fe*, and *Elmbrook II*, Concord had a captive audience on its hands—in terms of both students involved in performing arts classes and extracurricular activities, and their families and friends attending the show to support the students. That the school had a policy allowing students to opt out of participating in the Spectacular (an option some invoked) is irrelevant, because a choice to participate or miss out on a significant portion of the curriculum is an unconstitutional one.

Yet unlike *Lee*, *Santa Fe*, and *Elmbrook II*, here there was no religious activity in which performers or audience members had to partake during the Spirit of the Season. There was no prayer as in *Lee* and *Santa Fe*. No one passed out religious lit-

erature as in *Elmbrook II.* The show took place in a school au-
ditorium, not a church sanctuary, a religious space by defini-
tion. The component that came closest to religious activity,
reading from the New Testament, was removed in 2015 and
so we have no need to opine on it.

Despite the 2015 changes, plaintiffs say that they remain
concerned that students or audience members felt pressured
to support the religious aspects of the Spirit of the Season
when they saw others "reflecting on a religious hymn." With
the lights dimmed, mid-performance, however, it would have
been hard to observe the behavior of others, let alone be sure
that they were reflecting on the religiosity of the performance
rather than enjoying the entertainment or checking texts on
their cellphones. More compelling is plaintiffs' concern that
the powerful ovation (heard plainly on the recording of the
performance that was included in the record) at the display of
the nativity scene might pressure others to join the applause.
Yet given the context of this heated litigation, the loud clap-
ping was likely communicating opposition to the lawsuit
more than support for any particular religious belief. We an-
ticipate that reactions to the nativity in subsequent years will
be less fervent. Although the matter is not open-and-shut, we
see no reason to reverse the district court's conclusion on sum-
mary judgment that the 2015 show did not pressure individ-
uals to support any religious beliefs.

## C

Last, plaintiffs allege that the 2015 show has an unlawful
religious purpose. Under *Lemon v. Kurtzman*, 403 U.S. 602
(1971), a practice is unconstitutional if it lacks a secular objec-
tive. *Id.* at 612–13. We defer to a government's statement of its
own aims, *Edwards*, 482 U.S. at 586, but the professed objective

cannot be a sham or secondary to a religious goal, *McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 864 (2005).

Concord advances three objectives for the Spirit of the Season and the Spectacular generally. One is to provide a cultural education about December holidays, evidenced by the inclusion, even if brief, of songs to represent Hanukkah and Kwanzaa. In the 2015 version, before the musical numbers a student reads a short description of each holiday. We have recognized the educational role played by explanations such as the narratives here. *Books II*, 401 F.3d at 866 (finding a proper educational purpose for a display containing the Ten Commandments and secular texts, accompanied by explanations); see also *Ind. Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 773 (7th Cir. 2001) (finding that a similar display failed the endorsement test in part because "the planned monument lack[ed] any marker explaining why these particular texts" were put together).

Noting that the Jewish and African-American holidays were added only in response to litigation, plaintiffs reject the sincerity of this stated aim. They allege that the musical director's lack of research on the holidays (including the awkward fact that "Ani Ma'amin" is a Jewish song but not one specifically about Hanukkah) underscores the fact that cultural education was not truly Concord's aim. The purpose test "does not require us to evaluate the quality or sufficiency of the historical analysis" at issue. *Books II*, 401 F.3d at 866. And plaintiffs are correct that Hanukkah and Kwanzaa are given much shorter shrift than Christmas by song count. That in itself does not tell us too much, though. Nothing in the Constitution requires each holiday to get exactly the same number of minutes

on stage. That said, the plaintiffs have a point when they say that cultural education could be seen as an *ex post* justification.

The school's other two asserted purposes rest on sturdier ground. Concord puts on the program each year both to entertain the audience and to provide pedagogical opportunities for Concord's performing-arts students. The show originally was based on the Radio City Rockettes' Christmas Spectacular, after a marching band field trip to New York City. As one of a few productions put on by the department each year, the Spectacular provides many ways for students to grow. They learn challenging music and choreography. They go through the process of auditioning for solos and small group numbers. They design and create costumes, props, and sets. They stage lighting. They get the experience of performing live for large crowds. And younger students, who are bussed over for a performance of the show's first half, might have their interest in the department piqued. The plaintiffs seem to concede that these legitimate purposes are reasons to have a winter performance in general. Their only point is that these purposes do not justify the religious elements of the second half. But the Establishment Clause does not require schools to tailor their conduct narrowly to the stated aim. It mandates only that a religious purpose cannot be the primary motivation.

And here the district court reasonably concluded that it is not. The current Spectacular is primarily entertainment and pedagogy. The nativity scene, which was problematic in the 2014 and proposed versions, is no longer the second half's main event. Instead, as we already have said, it accompanies just one song, serving the same aesthetic purpose as the images projected on screens and other visuals. The second half

taken as a whole provided musicians and singers multiple op-
portunities to learn pieces and perform. This would have been
an easier case if the Christmas Spectacular had devoted a
more proportionate amount of stage time to other holidays.
But ultimately, we agree with the district court that in 2015
Concord sincerely and primarily aimed to put on an enter-
taining and pedagogically useful winter concert. We thus find
the 2015 iteration of the Spectacular constitutional no matter
which lens we use for evaluation.

### III

With this much of a victory under its belt, Concord would
like more. It asserts that because it cured the Spectacular's al-
leged constitutional defects with the current (and intended fu-
ture) version of the show, the plaintiffs' claims regarding the
2014 and proposed versions became moot. The district court
properly rejected this argument, as we now explain.

A claim becomes moot, and thus strips a court of jurisdic-
tion under Article III, "[w]hen a party with standing at the
inception of the litigation loses it due to intervening events."
*Parvati Corp. v. City of Oak Forest*, 630 F.3d 512, 516 (7th Cir.
2010) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.
(TOC), Inc.*, 528 U.S. 167, 189 (2000)). A case becomes moot if
events make it "absolutely clear that the allegedly wrongful
behavior could not reasonably be expected to recur." *United
States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203
(1968). The party asserting mootness bears the "heavy" bur-
den of proof on this "stringent" standard. *Friends of the Earth*,
528 U.S. at 189. A defendant's voluntary cessation of chal-
lenged conduct does not necessarily render a case moot. *City
of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). But

if a government actor sincerely self-corrects the practice at is-
sue, a court will give this effort weight in its mootness deter-
mination. *Wis. Right to Life*, 366 F.3d at 492.

Concord represents that it plans to continue presenting the
2015 version of the Spectacular. End of dispute, it concludes.
It supports this alleged commitment with the sworn declara-
tion of Superintendent John Trout. In his affidavit, Trout
states, "[T]he community, the School Board, administrators,
teachers, parents, and students engaged in a variety of infor-
mal discussions regarding the program on a going forward
basis." The conversations took place "at the local park, over
the water cooler, and across the fence and resulted in what
appeared to be a consensus that the program was a success
and that the changes should be made permanent."

Concord compares what it calls the "express commit-
ments" in Trout's affidavit to our decision in *Wisconsin Right
to Life*. In that case, a state campaign finance law remained on
the books though it had been declared unconstitutional. *Id.* at
487. A state board wrote in a letter to the plaintiff that the law,
which had never been enforced, would not be enforced
against it. *Id.* at 488. The board also posted online that the stat-
ute was unconstitutional. *Id.* Trusting in the state agency's sin-
cere self-correction, we found that the case was moot. *Id.* at
492.

The superintendent's informal assurances fall short of the
board's action in *Wisconsin Right to Life*. We have previously
resisted labeling cases moot in the face of similar promises. In
*Doe ex rel. Doe v. Elmbrook School District*, 658 F.3d 710 (7th Cir.
2011) ("*Elmbrook I*"), the school's superintendent and principal
represented that they did not intend to hold the graduation
ceremony in a church again, though at oral argument the

school hedged by saying that it would not "rule out using the Church in the future should the need arise." *Id.* at 720. We held that the school failed to establish mootness because it did not adopt a policy formally prohibiting the use of churches for graduation. *Id.* at 720–21; *Elmbrook II*, 687 F.3d at 842 (vacating *Elmbrook I* but adopting the original panel's justiciability analysis). The Supreme Court has also taken a strict approach to voluntary cessation. Recently the Court found that a *governor's* announcement of voluntary cessation was insufficient to meet the heavy burden required to moot a case. *Trinity Lutheran*, 137 S. Ct. at 2019 n.1. That case involved a challenge to a Missouri agency's policy of categorically disqualifying religious organizations from grant funding. Though "the Governor of Missouri announced that he had directed the Department to begin allowing religious organizations to compete for and receive Department grants on the same terms as secular organizations," there was nothing preventing the agency from reinstating its old policy at any time. *Id.*

As in *Elmbrook* and *Trinity Lutheran*, we cannot give definitive weight to the superintendent's statements. Trout equivocates in his affidavit that the changes *should* be adopted permanently because of the *apparent* consensus. But there is no evidence that any change was actually made. Though the school board had the authority to adopt official policies, IND. CODE § 20-26-5-4(a)(18), Concord, like Elmbrook, failed to document in any way its decision to make the changes permanent. And despite Trout's assertion that he decided along with the school board to make the changes permanent in December 2015, the minutes of the school board meetings from December 2015 and January 2016 contain no discussion of the Christmas Spectacular. See IND. CODE § 5-14-1.5-1 (requiring public agencies, including schools, to conduct official action

openly). Though the district court determined that Trout was sincere in his affidavit, there is no guarantee that a future superintendent would take the same stance. See *Boyd v. Adams*, 513 F.2d 83, 89 (7th Cir. 1975) (determining that a challenge was not moot since a new decision-maker could "resurrect the old procedure in the future").

In an attempt to bolster the credibility of the superintendent's stated intentions, Concord cites the deposition testimony of Scott Spradling, the school's music director. Spradling stated that the changes to the 2015 program were going to be made permanent. He made this promise, however, *before* the preliminary injunction was issued, meaning that he was referring to the changes in the *proposed* show—not the 2015 show. Concord also refers to its Rule 68 Offer of Judgment. In late December 2015, the school district offered permanently to enjoin the use of biblical readings and a living nativity scene in exchange for plaintiffs' agreement not to pursue any further relief. As the district court noted, an offer of judgment is a litigation tactic, not a binding future commitment. Plaintiffs rejected the deal, at which point it was dead. We have no reason to infer that Concord will adhere to its terms without any consideration from the other side. See FED. R. CIV. P. 68(b) (unaccepted offers are generally inadmissible). Finally, we place little weight on the fact that Concord no longer defends the constitutionality of the 2014 or proposed versions. The school was still considering an appeal of the preliminary injunction ruling in May 2016, five months after the superintendent and school board allegedly made the 2015 version permanent. This timing undercuts any inference that the district had indeed given up any claim of right to return to the earlier versions.

It is easy to envision the school bringing back the nativity scene of Spectaculars past given the Concord community sentiment. A Facebook page entitled "Save Concord's Christmas Spec's Nativity Scene" had over 7,000 likes. Hundreds of people wore t-shirts specially printed for the occasion to a school board meeting on the topic. Yard signs were made. Someone even sent FFRF a death threat!

Concord has objected to the consideration of public opinion as part of the mootness analysis. But it was the school itself that made public opinion relevant: Trout said consensus was reached after speaking with "parents" and members of the "community." By looking at a factor that admittedly entered into the school's decision-making, we are not impermissibly imputing private citizens' motives to government actors. *Contra City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 196 (2003). The fact that the superintendent took community members' reactions to the 2015 show into account when opting to retain the changes indicates that he may do so again. That in turn undermines any comfort we might take in Concord's assurances now that public opinion will be irrelevant to its future decisions about the Spectacular's content.

Though Concord describes its position as one of "repeated and firm policy commitments," it has failed to meet its stringent burden to establish mootness. Because the plaintiffs' challenges to the 2014 and proposed versions remain live controversies, we need not decide the jurisdictional issue Concord raised—whether a suit for nominal damages alone is a sufficiently justiciable controversy under Article III.

Finally, since the parties have not questioned the district court's decision on the merits or remedies for the claims relating to the 2014 and proposed shows, they are not before us on

this appeal. We thus refrain from any comment on those issues.

**IV**

The parties put us in the uncomfortable role of Grinch, examining the details of an impressive high school production. But we accept this position, because we live in a society where all religions are welcome. The district court found that the Christmas Spectacular program Concord actually presented in 2015—a program in which cultural, pedagogical, and entertainment value took center stage—did not violate the Establishment Clause. We AFFIRM this judgment.

EASTERBROOK, *Circuit Judge,* concurring in the judgment. The majority's opinion applies recent decisions of this circuit and various "tests" announced (often by less than a majority) in some decisions of the Supreme Court. This makes it hard to quarrel with the result. But as I think many of those decisions incorrect, I do not join the opinion.

It is not sound, as a matter of history or constitutional text, to say that a unit of state or local government "establishes" a religion through an artistic performance that favorably depicts one or more aspects of that religion's theology or iconography. The Concord Community Schools would not violate the Constitution by performing Bach's Mass in B Minor or Handel's Messiah, although both are deeply religious works and run far longer than the nativity portion of the "Christmas Spectacular." Performing a work of art does not establish that work, or its composer, as the state song or the state composer; no more does it establish a state religion. The Supreme Court's decisions permitting legislatures to open their sessions with prayer show this. See, e.g., *Greece v. Galloway*, 134 S. Ct. 1811 (2014).

It takes taxation or compulsory worship to establish a religion; some form of coercion is essential. This is the view of scholars who have investigated what the phrase "establishment of religion" meant in the Eighteenth Century, when these words were adopted. See generally Leonard W. Levy, *The Establishment Clause: Religion and the First Amendment* (2d ed. 1994); Philip Hamburger, *Separation of Church and State* 89–107 (2002); Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105 (2003). Nothing about the Christmas Spectacular affects anyone's taxes or coerces any

form of religious belief, expression, or attendance. That should be enough to resolve this suit.

I have made these points before, and at greater length. See *American Jewish Congress v. Chicago*, 827 F.2d 120, 128–40 (7th Cir. 1987) (dissenting opinion); *Doe v. Elmbrook School District*, 687 F.3d 840, 869–72 (7th Cir. 2012) (en banc) (dissenting opinion). Repetition would be otiose.

Although the Concord Community Schools have not violated the Constitution, the judiciary's performance is harder to defend. Federal judges have picked through a performance to choose among elements with religious significance. Preventing that sort of entanglement between the judiciary and religious expression is a main goal of the First Amendment—yet we are at it again, playing the role of producer to decide which material, representing what religious traditions, may appear in a choral performance. Cf. *Bormuth v. Jackson County*, 870 F.3d 494, 521–25 (6th Cir. 2017) (en banc) (Sutton, J., concurring).