In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 19-2807

SPEECH FIRST, INC.,

*Plaintiff-Appellant,*

*v.*

THOMAS L. KILLEEN, *et al.*,

*Defendants-Appellees.*

---

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:19-cv-03142-CSB-EIL — **Colin S. Bruce**, *Judge.*

---

ARGUED FEBRUARY 27, 2020 — DECIDED JULY 28, 2020

---

Before BRENNAN, SCUDDER, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Colleges and universities unquestionably benefit from the free flow of ideas, debate, and deliberation on campus. These institutions should strive to foster an environment where critical thought, and sometimes strong disagreement, can flourish. Indeed, "[f]reedom of expression and academic freedom are at the very core of the mission of colleges and universities, and limiting the expression of ideas would undermine the very learning environment that is

central to higher education." Erwin Chemerinsky & Howard Gillman, Free Speech on Campus x (Yale Univ. Press 2017).

Speech First—a national advocacy organization dedicated to promoting the exercise of free speech on college campuses—alleges that three distinct policies at the University of Illinois at Urbana-Champaign ("the University") threaten these ideals and impermissibly chill the speech of student members of its organization. It seeks a preliminary injunction to put a halt to these policies.

When a party seeks a preliminary injunction before the district court, the burden rests on that party to demonstrate that it has standing to pursue its claims. Speech First failed to meet that burden for two of the policies it challenges; namely, it failed to demonstrate that its members face a credible fear that they will face discipline on the basis of their speech as a result of those two policies. And for its challenge to the third policy, that claim is moot. The district court therefore correctly denied the motion for a preliminary injunction, and we affirm.

## I. Background

Speech First sued 29 administrators at the University on behalf of four anonymous students. These students claim that they wish to express what they describe as "political, social, and policy views that are unpopular on campus." Speech First's complaint lists examples of such viewpoints in general terms: opposition to abortion, support for President Trump, belief in traditional marriage, support for strong immigration policies, support for the "deradicalization of Islam," support for First Amendment protection of "hate speech," opposition to gun control, and support for LGBT rights.

Speech First alleges that three University policies—the responsive action of the Bias Assessment and Response Team and the Bias Incident Protocol to reports of "bias-motivated incidents" on campus, the imposition of No Contact Directives, and the prior approval rule—chill their student members' speech, force these students to engage in self-censorship, and deter them from speaking openly about issues of public concern.

## A. Bias Assessment Response Team and Bias Incident Protocol

Speech First challenges the actions of the University's Bias Assessment and Response Team ("BART"). BART "collects and responds to reports of bias-motivated incidents that occur within the University of Illinois at Urbana-Champaign community." In turn, BART defines "bias-motivated incidents" as "actions or expressions that are motivated, at least in part, by prejudice against or hostility toward a person (or group) because of the person's (or group's) actual or perceived age, disability/ability status, ethnicity, gender, gender identity/expression, national origin, race, religion/spirituality, sexual orientation, socioeconomic class, etc." In addition, BART "[p]rovides opportunities for educational conversation and dialogue" and "[s]upports those impacted by bias."

BART is administratively housed within the Office for Student Conflict Resolution ("OSCR"). In addition to BART, OSCR houses two other functions: (a) voluntary alternative conflict resolution services and (b) enforcement of the Student Code. Members of BART come from various departments across the University: OSCR; the University Housing Office; the Office of Student Affairs; the Office of Diversity, Equity, and Inclusion; the Student Assistance Center; the student

union; and the University Police Department, which supplies a law enforcement liaison to BART.

Any member of the University community can report to BART by sending an email to the BART-specific email address or through a webform on the BART website. The webform does not require the reporter to identify himself, and the majority of BART reporters remain anonymous. One of the BART Co-Chairs enters the report into an internal database. A Co-Chair will promptly address any incidents that require a simple response. This could include, for example, a report of a swastika drawn on a bathroom door, where a Co-Chair will call the facilities department to erase it. For those incidents that do not allow for as straightforward of a resolution, BART members discuss reports at a bi-weekly meeting and determine whether to reach out to the involved students, if they are identified, to invite them to participate in a voluntary conversation. BART also devises a response plan, which could include "[e]ducational conversations," "[m]ediation, facilitated dialogue," "[e]ducational referrals," "[r]esolution agreements," or "[r]eferrals to other offices and/or programs."

If the reporting party is identified and wishes to meet, a BART staff member will discuss the report with the student and offer support. If the reporting party identifies the offender, a BART staff member will contact that person via email to schedule a voluntary meeting. Notably, the majority of students who BART contacts either do not respond or decline to meet. Students who decline suffer no consequences. If a student agrees to meet, BART staff explains to the student that her conduct drew attention and gives the student an opportunity to reflect upon her behavior and its impact on other

students. BART cannot require students to change their behavior and does not have authority to issue sanctions if they decline to do so.

Justin Brown, Director of OSCR and a former Chair of BART, states in a declaration that BART keeps private all interactions with students, and interactions do not appear in students' academic or disciplinary records. BART does, however, publish an annual report of incidents with all personally identifiable information removed from its data and descriptions. Examples of these descriptions, in their complete form, include:

- "The pillars outside of Foellinger Auditorium were chalked with the phrases, 'Women are Worthless' and 'Go White Privilege.' Facilities removed the chalking within an hour of it being reported."
- "A student reported that another student said to him, 'I voted for Trump because I want to deport you guys. Enjoy the last few months in America.' A member of the team met with both of the students involved."
- "There were multiple reports (41) that an RSO posted on Facebook that they were going to hold an 'Affirmative Action Bake Sale' where they would charge different prices based on race and ethnicity. A member of the team met with the leadership of the RSO. All of the people that reported were contacted, and many of them met with a member of the team."

January Boten, Assistant Dean of Students at the University and a Co-Chair of BART, asserts in an affidavit that "[a]ny contact a student has with BART—whether the student reporting an incident or the student who is alleged to have engaged in the reported behavior—is entirely voluntary."

Expressing the views Speech First describes in its complaint does not violate the University's Student Code. Thus, Boten explains, students "could not face discipline at the University solely as a result of expressing those opinions," although "some behavior motivated by bias may *also* violate the Student Code." (emphasis in original). Such behavior could include physical violence, stalking, true threats, and sexual harassment. BART has no independent disciplinary authority, and therefore the student disciplinary process, rather than BART, addresses this sort of behavior. Boten represents that reports made to BART "are not 'referred' from BART to the University Police, nor do the police ever investigate an incident reported to BART unless that incident independently was reported to the Police for law enforcement reasons." Relatedly, there is no evidence that the liaison to BART from the University Police has any law enforcement function in her capacity as a BART member.

Speech First National President Nicole Neily submitted a declaration that states she is "aware of how BART operates." Neily has no present connection to the University: she is not a current student, nor is she a member of the faculty or staff. Because she lacks first-hand information about the University's current policies and procedures, she relies on what she has learned through her discussions "with Speech First members and other students who attend and have attended the University"—Students A, B, C, and D. Neily explains her general understanding of BART's procedures, based on these conversations:

> When a BART official contacts the offender, the official tells the student that the BART has received a bias report about the student and that the BART needs to

> speak with the student to discuss the allegations. The BART official will not identify the person who has accused the student of "bias" or inform the student of any rights he or she may have.

In addition, Neily asserts that, if BART determines the identity of the student who committed the bias-motivated incident, "it will record the details of the incident on the student's permanent record" and "will make this information available to others outside of the BART." Neily reports that one student's advisor told him "that he could see from the student's files that the student had met with someone from the BART." Neily provides no other detail about BART and its operations.

In addition to BART, the University maintains a similar but separate system—called the University Housing Bias Incident Protocol ("BIP")—to address bias-motivated incidents committed within University housing. Like the BART process, residents can report an incident to a centralized BIP email address, through a web form, or to a University Housing staff member who lives in their building. Approximately half of the reports to BIP are anonymous, and more than half do not provide the name of the alleged offender. Also, like BART, a committee of University staff meets to determine what course of action is appropriate in response to a report, and whether to invite identified students to participate in a voluntary conversation with a BIP staff member. If, after a meeting, a student wishes to persist with his or her conduct, the staff member cannot sanction the student.

Alma Sealine, the Executive Director of University Housing, asserts in her affidavit that BIP "is entirely voluntary, both for the student making a bias incident report and for the student (if identified) whose comments or actions have

prompted the report." "[T]here are no sanctions, punishments, or discipline of any kind associated with a reported incident." When a student breaches his or her housing contract or violates University policy through, for example, acts of theft, vandalism, possession of weapons, or hosting unapproved overnight guests, students must endure a separate disciplinary process. Expression of the views Speech First describes in its complaint would not contravene housing contracts nor violate any University policies.

Speech First did not submit any evidence to the district court contradicting Sealine's affidavit. In fact, Neily's declaration omits any mention of BIP.

**B. No Contact Directives**

Pursuant to the University's Student Disciplinary Procedures, University disciplinary officers may direct an individual subject to student discipline to have no contact with one or more other persons through what the University calls "No Contact Directives" ("NCDs"). Students subject to NCDs may not engage "in oral, written, or third party communication" with other identified parties and may not partake in certain "deliberate nonverbal acts intended to provoke or intimidate a protected party." Although NCDs do not require students to maintain a specific physical distance from one another, the University advises the parties to leave the vicinity if the other party appears. NCDs do not, on their own, constitute a disciplinary finding against students and are not part of the students' official disciplinary records. Although an NCD prohibits a student from contacting another student, it does not prohibit the student from talking or writing about the other, either privately or publicly. The Student Disciplinary

Procedures recommend dismissal from the University for students who violate NCDs.

Section 4.06(a) of the Student Disciplinary Procedures outlines the authority of the University to impose NCDs, stating that "University disciplinary officers are among those responsible for the enforcement of student behavioral standards and, when possible, the prevention of violations of the Student Code." Section 4.06(d) outlines the procedure for imposing NCDs: "If, based upon a report received or a direct request from a member of the university community, a disciplinary officer believes that a No Contact Directive is warranted, the disciplinary officer will notify all recipients in writing, typically by email."

Brown describes the common reasons for the imposition of NCDs:

> [O]f the 103 No Contact Directives issued in the 2018-2019 academic year, approximately 62% were imposed during the pendency of an investigation into allegations of a violation of the Student Code. In addition, approximately 28% were imposed as a result of informal Title IX complaints that alleged sexual misconduct but requested no investigation be conducted. During the same year, only 11 cases—approximately 11% of cases—involved no pending investigation or an informal Title IX complaint. These directives were issued when a severe, prolonged, and/or escalating conflict between students suggested that a violation of the Student Code, and in some cases physical violence, was likely in the near future.

Similarly, Rony Die, Associate Director of OSCR, represents that the University only imposes NCDs in response to violations of the Student Code or to prevent potential violations. Both Brown and Die assert that no students have ever been subject to NCDs for expression alone.

To rebut the University's contentions, Speech First points to an NCD imposed between students Tariq Kahn and Andrew Minik after Minik published an article about Khan attacking two students at an "anti-Trump" rally. Minik wrote an email to Die, who issued the NCD, to confirm his understanding of the limitations the NCD imposed. He acknowledged that "the no contact order [did] not prevent [him] from writing journalistic stories related to Khan," but that Die merely "suggest[ed] that [he] not write about him" for the situation to improve. In this email, Minik also recognized that the NCD "is not a direct disciplinary charge." The district court, which is also presiding over a separate lawsuit involving the Minik–Khan interactions, summarized: "Die described the history of escalation between Minik and Khan, including Khan receiving death threats which he believed were caused by Minik, and Khan's anger towards Minik over the same, and Die stated that the No Contact Directive would not have been issued absent that history."

## C. Prior Approval Rule

Before this lawsuit was filed, Student Code § 2-407 prohibited students from "post[ing] and distribut[ing] leaflets, handbills, and other types of materials" about candidates for non-campus elections without "prior approval." The University Student Disciplinary Procedures explain that a student who violates the Student Code faces disciplinary action, including reprimand, censure, probation, suspension, and

dismissal from the University. There is no evidence in the record that the University ever enforced the prior approval rule.

The Student Code was amended to repeal the rule shortly after this lawsuit was initiated. To eliminate the provision, the University followed the steps set forth in the University's published "Procedure for Amending the Student Code." On July 15, 2019, the Conference on Conduct Governance—a standing committee of the Urbana-Champaign Senate that includes faculty members, administrators, and students—voted to enact an amendment to the Student Code abolishing the prior approval rule. The Chancellor approved this amendment on July 18—four days before the University filed its opposition to Speech First's preliminary injunction motion— and it went into effect immediately. The current version of the Student Code reflects this amendment. Through the sworn declaration of Associate Dean of Students Rhonda Kirts, the University represented both to the district court and to this Court that it has no intention of restoring the eliminated provision.

### D. Procedural History

Speech First brought this lawsuit against University administrators in their official capacities, challenging the three aforementioned policies and seeking declaratory and injunctive relief. Speech First quickly moved for a preliminary injunction to enjoin the University from enforcing the prior approval requirement; using the BART and BIP processes to "investigate, log, threaten, or punish students (including informal punishments) for bias-motivated incidents"; and issuing NCDs "without clear, objective procedures ensuring the directives are issued consistent with the First Amendment." In support of its motion, Speech First offered a three-page

declaration from its national president, Nicole Neily, who communicates second- (and sometimes third-) hand information about BART's operations that she purportedly received from current and former students. Speech First did not specifically identify any student member who provided such information or submit declarations from any student member, even pseudonymously. As a result, no student at the University explained to the district court any specific speech they wished to engage in, nor did any student explain how the challenged policies have discouraged them from expressing their views. The University, by contrast, contradicted Neily's generalized affidavit with detailed declarations, supported by twenty-five exhibits, from five University administrators, all of whom are intimately involved with BART, BIP, or student discipline. Neither party presented live testimony.

In ruling on the preliminary injunction motion, the district court described the declaration Speech First submitted from Neily as "a conclusory statement based on its national association's president's 'familiarity with' anonymous students," to the effect that the "Students' expressing their views on (very generally-described) topics could result in their being reported, investigated, and punished by BART for engaging in a bias-motivated incident." The court found "more informative the detailed statements about BART from University staff that are personally involved with BART, consistently describing how BART operates."

The district court denied the preliminary injunction motion. The court held, first, that Speech First's claim related to the prior approval requirement was moot, and second, that Speech First failed to demonstrate standing to challenge the BART and BIP processes and the imposition of NCDs.

Specifically, regarding standing, the district court found that Speech First did not show that its members face a credible threat of enforcement or that the policies have an objective chilling effect on their speech. Speech First appealed.

## II. Discussion

To obtain a preliminary injunction, a plaintiff must show that: (1) without this relief, it will suffer "irreparable harm"; (2) "traditional legal remedies would be inadequate"; and (3) it has some likelihood of prevailing on the merits of its claims. *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018). If a plaintiff makes such a showing, the court then must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it. *Id.* (citing *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)). If the plaintiff is likely to win on the merits, the balance of harms need not weigh as heavily in his favor. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984)). This balancing process also considers the public interest, or the effects the preliminary injunction—and its denial—would have on nonparties. *Id.*

The party seeking a preliminary injunction bears the burden of showing that it is warranted. *Courthouse News Serv.*, 908 F.3d at 1068 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). "We 'will not reverse a district court's grant or denial of a preliminary injunction absent a clear abuse of discretion by the district court.'" *Joseph v. Sasafrasnet, LLC*, 734 F.3d 745, 747 (7th Cir. 2013) (quoting *Moody v. Amoco Oil. Co.*, 734 F.2d 1200, 1217 (7th Cir 1984)). We review the district court's legal conclusions de novo and findings of fact for

clear error. *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018). Absent such errors, we afford a district court's decision "great deference." *Id.*

## A. Standing

Speech First challenges the district court's ruling that it failed to demonstrate standing to seek a preliminary injunction against the University's BART, BIP, and NCD policies. Speech First's burden to demonstrate standing in the context of a preliminary injunction motion is "at least as great as the burden of resisting a summary judgment motion." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 907 n.8 (1990). Thus, Speech First must "'set forth' by affidavit or other evidence 'specific facts'," rather than "general factual allegations of injury." *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 801–02 (7th Cir. 2016).

To establish standing under Article III of the Constitution, a plaintiff must show (1) an "injury in fact," (2) that the challenged conduct caused the injury, and (3) some likelihood that a decision in his favor will remedy the injury. *Susan B. Anthony List v. Driehaus ("SBA List")*, 573 U.S. 149, 157–58 (2014). An association has standing to sue on behalf of its members when: (a) its members would have standing to sue on their own; (b) the interests the association "seeks to protect are germane to the organization's purpose"; and (c) "neither the claim asserted nor the relief requested requires the participation of individual members." *Hunt v. Washington State Apple Advert. Com'n*, 432 U.S. 333, 343 (1977). No party disputes that, if its members were to have standing, Speech First would have associational standing. Rather, Speech First disputes the district court's conclusion that it could not show an injury in fact.

For an injury to satisfy Article III standing requirements, it must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *SBA List*, 573 U.S. at 158 (quoting *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992)). Where the plaintiff brings a facial challenge under the First Amendment, a prior enforcement action is not required. *Id.* at 158–59. In the absence of an enforcement action, though, plaintiffs must make one of two showings to establish an injury in fact. First, a plaintiff may show an intention to engage in a course of conduct arguably affected by a policy, and that he faces a credible threat the policy will be enforced against him when he does. *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 590–91 (7th Cir. 2012) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Second, a plaintiff may show a chilling effect on his speech that is objectively reasonable, and that he self-censors as a result. *Bell v. Keating*, 697 F.3d 445, 454 (7th Cir. 2012) (citing *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) ("[A] plaintiff's notional or subjective fear of chilling is insufficient to sustain a court's jurisdiction under Article III.")). For either that credible threat of enforcement or chilling effect to be "'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560); *see also Bell*, 697 F.3d at 454 ("The plaintiff must substantiate a concrete and particularized chilling effect on his protected speech or expressive conduct to pursue prospective relief.").[1]

---

[1] We note these two showings have some degree of overlap. As the Fourth Circuit has recognized, "Either way, a credible threat of enforcement is critical; without one, a putative plaintiff can establish neither a realistic threat of legal sanction if he engages in the speech in question, nor

It is uncontested that the University has not investigated or punished any of the students who are members of Speech First pursuant to any of the challenged University policies. Rather, Speech First asserts that the University's policies chill the students' speech because the students fear the University will investigate or punish them under these policies.

### 1. BART and BIP

We first turn to whether Speech First has established the injury in fact requirement concerning its claims against BART and BIP, namely, whether it has demonstrated that these policies pose a credible threat of enforcement to any student or whether any student has faced an objectively reasonable chilling effect on his or her speech. Important for our analysis is the nature of our review: we must leave the factual findings of the district court undisturbed unless "on the entire evidence" we are "left with the definite and firm conviction that a mistake has been committed." *Girl Scouts*, 549 F.3d at 1086 (quoting *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 573

---

an objectively good reason for refraining from speaking and 'self-censoring' instead." *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018). Indeed, "[w]hen plaintiffs 'do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible,' they do not allege a dispute susceptible to resolution by a federal court." *Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010) (quoting *Babbitt*, 442 U.S. at 298–99). Nevertheless, we search for both showings. *See, e.g., Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 473–74 (7th Cir. 2012) (recognizing that the plaintiff may show only that she faces "a realistic danger of sustaining a direct injury as a result of the statute's operation of enforcement" and that "the chilling of protected speech may thus alone qualify" as an injury in fact ).

(1985)). The district court made several factual findings about BART in particular, and Speech First has not demonstrated that any are clearly erroneous and did not submit evidence disputing many of them. Furthermore, the Neily declaration does not even mention BIP. Because Speech First did not submit any evidence beyond the Neily declaration, it has not disputed or raised any factual challenge to the BIP information and therefore the district court did not commit any clear error in its findings regarding that policy.

First, the district court found that "[t]he disciplinary processes do not apply to students expressing the views the Students wish to express or any other opinions. Bias-motivated speech alone is not a Student Code violation." Thus, the district court concluded that "being reported to BART or BIP results in essentially no consequences." Speech First does not dispute these findings, which undermine its contention that its members face a credible threat of enforcement.

Second, the district court found that "[t]he Students have not described any statements they wish to make with any particularity, so it is unclear whether they would even be likely to be reported to BART or BIP." The Fourth Circuit's decision in *Abbott v. Pastides*, 900 F.3d 160 (4th Cir. 2018), is instructive here. In that case, students received official letters instructing them to attend a mandatory meeting with University of South Carolina officials after the students hosted a "Free Speech" event. *Id.* at 163. The student brought a facial challenge to the university's harassment policy, arguing that it was unconstitutionally vague and overbroad. *Id.* The Fourth Circuit concluded that, because plaintiffs failed to identify any speech event they planned or wished to sponsor in the future, they had not demonstrated that that the defendants "deterred

some specific intended act of expression protected by the First Amendment." *Id.* at 171. Similarly, here, Speech First has failed to identify in the record specific statements any students wish to make that the University's policies have chilled. *See Bell*, 697 F.3d at 454 (requiring a showing of a particularized chilling effect).

Third, the district court found that "[c]onversations with BART are optional. Most students contacted by BART do not respond at all, or decline the offer of a meeting, and no consequences occur if a student declines to meet with BART." Speech First insists "[n]o student would see these requests from BART as voluntary." Its only support for this bold assertion is Neily's discredited declaration that BART officials tell students that BART needs to speak with them. The district court's finding of fact is not clearly erroneous, especially considering that Speech First offers only a broad statement from someone lacking first-hand experience with BART who in turn relies solely on information from unidentified students. If students' perception of reality on campus is different from the picture the University describes, Speech First has put forth no evidence—other than Neily's general, conclusory contentions—to demonstrate that is so: nothing in the record shows that any individual student fears potential consequences resulting from an invitation to meet with BART, or consequences from declining that invitation, and has self-censored because of those fears. *See Laird*, 408 U.S. at 11 (plaintiffs must show a chilling effect occurred because they are "either presently or prospectively subject to" a challenged policy). Furthermore, the fact that a majority of students actually decline a meeting supports the conclusion that students do *not* feel compelled to meet.

This same factual finding—that students view the conversations with BART as optional—distinguishes this case from *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). Speech First cites this case for the proposition that "[c]ourts do not ignore First Amendment problems simply because state defendants promise that their interactions are 'voluntary.'" In *Bantam*, the Rhode Island Commission to Encourage Morality in Youth sent dozens of notices to a publication distributor stating that certain publications were inappropriate for sales to youth. 372 U.S. at 59–61. The Supreme Court characterized the Commission's notices "virtually as orders" that were "reasonably understood to be such by the distributor," with "invariabl[e] follow[] up by police visitations." *Id.* at 68. The notices, the Court determined, were really "thinly veiled threats." *Id.* Here, the district court found no such threats; rather, the court concluded invitations to meet with BART staff are "voluntary" and result in "essentially no consequences."

*Abbott* provides useful guidance on this point, as well. There, the Fourth Circuit held that the prospect of facing a *mandatory* meeting and subsequent investigation was insufficient to make a showing of standing. The court even acknowledged, "[W]e do not doubt that a college student reasonably might be alarmed and thus deterred by an official letter from a University authority … raising the prospect of an investigation and ultimate recommendation to the University Provost and President, directing his attendance at a meeting, and prohibiting him from discussing the matter with others." 900 F.3d at 171. The court nevertheless concluded,

> [A] threatened administrative inquiry will not be treated as an ongoing First Amendment inquiry sufficient to confer standing unless the administrative

> process itself imposes some significant burden. … Even an objectively reasonable "threat" that the plaintiffs might someday have to meet briefly with a University official in a non-adversarial format, to provide their own version of events in response to student complaints, cannot be characterized as the equivalent of a credible threat of "enforcement" or as the kind of "extraordinarily intrusive" process that might make self-censorship an objectively reasonable response.

*Id.* at 179. It follows that if a mandatory meeting does not demonstrate a credible threat of enforcement, neither does an invitation to an optional one.

Fourth, the district court found that "[w]hile some BART staff are drawn from departments with disciplinary or law enforcement functions, BART has no such functions. … BART has no authority to impose sanctions, and BART does not require any student to change his behavior." Speech First does not contest the district court's finding that BART itself does not have disciplinary authority. Instead, Speech First points to the possibility that BART may refer potential Student Code violations to OSCR and potential legal violations to the University Police. But again, as the district court found, "[b]ias-motivated speech alone is not a Student Code violation," and thus would not be the sole basis for a referral. BART does not determine whether punishment is warranted or impose such punishment; rather, that determination is left to the OSCR or the Police.

As Speech First does not dispute that BART lacks disciplinary authority, it cites *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015), for the proposition that the University can chill speech without threatening an investigation or prosecution,

and even without "authority to take any official action." *Id.* at 236. But *Backpage* is readily distinguishable. In that case, Cook County Sheriff Thomas J. Dart sent a letter on his official letterhead to credit card companies, stating, "As the Sheriff of Cook County, a father and a caring citizen, I write to request that your institution immediately cease and desist from allowing your credit cards to be used to place ads on websites like Backpage.com." *Id.* at 231. He also wrote that the companies' involvement with Backpage.com had "become increasingly indefensible," and that "[f]inancial institutions … have the legal duty to file 'Suspicious Activity Reports' to authorities in cases of human trafficking and sexual exploitation of minors." *Id.* at 232. He included a citation to the federal money-laundering statute, 18 U.S.C. § 1956, insinuating that the credit card companies could be prosecuted for their failure to comply. *Id.* The letter instructed the companies to provide contact information for an individual who the Sheriff could "work with on this issue." *Id.* A strategy memo by a member of the Sheriff's staff also proposed approaching the credit card companies with "threats in the form of 'reminders'" about "their potential susceptibility to 'money laundering prosecutions … and/or hefty fines.'" *Id.* Two days after sending the letter, the Sheriff's Office issued a press release captioned "Sheriff Dart's Demand to Defund Sex Trafficking Compels Visa and MasterCard to Sever Ties with Backpage.com." *Id.* "The causality [was] obvious." *Id.* at 233. We concluded "the letter was not merely an expression of Sheriff Dart's opinion. It was designed to compel the credit card companies to act by inserting Dart into the discussion." *Id.* at 232.

The University's invitation to a voluntary meeting falls well short of the level of coercion the Sheriff invoked in *Backpage*. Although the Sheriff did not threaten the companies

with an investigation or prosecution, a letter on official letter-
head demanding action, condemning their activities, and re-
minding them of their potential liability is a far cry from a vol-
untary invitation to a meeting. Comparing the impact of the
Sheriff's letter to that of BART's outreach demonstrates this is
true: whereas most students do not respond to BART's re-
quests, Visa and MasterCard immediately ended their rela-
tionship with Backpage. "[T]he fact that a public-official de-
fendant lacks direct regulatory or decisionmaking authority
… is not necessarily dispositive[.]" *Okwedy v. Molinari*, 333
F.3d 339, 344 (2d Cir. 2003) (per curiam). "What matters is the
distinction between attempts to convince and attempts to co-
erce." *Id.* Whereas Sheriff Dart's letter was an "attempt to co-
erce," the University's actions are, at worst, an "attempt to
convince." Particularly when the majority of students BART
contacts decline a meeting, Speech First's speculation that
BART's outreach carries an implicit threat of consequences
lacks merit.

On appeal, Speech First highlights two out of the dozens
of bias-motivated incidents and resulting responses in the rec-
ord to demonstrate that, contrary to the University's asser-
tions, BART refers some incidents to University Police. These
two incidents include:

- "Team members participated in reporting [an offen-
  sive] page to Facebook and consulted with police, who
  were unable to identify those responsible for the page."
- "A staff member from the Counseling Center received
  emails that were sexually explicit and targeting Asian
  women. The staff member was given information on
  resources and information about the person who sent
  the emails was given to police."

As a preliminary matter, Speech First failed to raise these incidents before the district court. "It is the parties' responsibility to allege facts and 'indicate their relevance under the correct legal standard.'" *Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721 (7th Cir. 2008) (quoting *APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002)). Speech First has therefore waived this argument.

But even if Speech First had raised these facts before the district court, they do not demonstrate that Speech First has standing to challenge BART. First, Speech First did not present evidence to the district court that BART would refer a student to University Police on the basis of speech independent of a violation of the Student Code or because a student declined to respond to BART outreach. BART, like any member of the University community, could report a potential Student Code violation to OSCR or the Police without infringing on any student's right to free speech. And if BART does make a referral to University Police in appropriate circumstances, Speech First has not demonstrated that BART has any power to punish: that determination is left to OSCR or the Police. Accordingly, Speech First has not put any evidence in the record to demonstrate that the law enforcement liaison to BART from the University Police Department was involved in either of the purported referrals or in interactions with any of the individuals who made or are identified in complaints. The mere possibility of a referral does not demonstrate standing.

We acknowledge some practicalities influencing this conclusion. Consider, for example, if BART were to learn of a violation of the law, or of a potential violation, such as one that might put a student in imminent danger. The fact that this knowledge came through a BART webform or through an

email to the BART email address does not prevent BART from sharing this information with law enforcement. The ability of BART to inform the relevant authorities of a violation, when there would be no threat of sanction on the basis of speech absent that violation, does not alone result in a First Amendment harm.

Speech First also cites the commonalities between this case and the Sixth Circuit's recent decision in *Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019), where Speech First challenged the University of Michigan's equivalent of BART—what the court called the Response Team—along with other policies. In that case, the Sixth Circuit, emphasizing the Response Team's referral power, reversed the district court's denial of a preliminary injunction on standing grounds. *Id.* at 765. The court noted that although the referral itself does not punish speech, it "subjects students to processes which could *lead* to those punishments" and thus to "consequences that [the student] otherwise would not face." *Id.* The court continued, "a student who knows that reported conduct might be referred to police or OSCR could understand the invitation to carry the threat: 'meet or we will refer your case.'" *Id.* Here, though, Speech First has put forth no evidence that BART will refer students for a failure to respond to their outreach or accept a meeting. Nor did Speech First present evidence that students at the University of Illinois interpret the invitation to meet with BART as an implicit threat. Indeed, the record supports a contrary conclusion—the fact that the majority of students decline to meet signals that students do not fear consequences from their refusal to participate.

Lastly, the district court found that "BART interactions with students are private, not recorded in academic or

disciplinary records, and not disclosed outside of OSCR without permission." Neily's declaration purports to contradict this point, stating that BART lists details of reported incidents on students' permanent records and makes this information publicly available. Neily's declaration also cites a third-hand statement from an unknown student's advisor, where the advisor told the student that he could see in the student's file that the student had met with BART. The district court discredited these assertions for good reason: the annual reports BART issues to the public—the only examples of BART reporting in the record—are completely anonymized with essentially no way to track down the identity of any offender. Furthermore, Speech First has not provided any evidence—through Doe affidavits or otherwise—that any individual student fears the possible publication of student speech in these annual reports or that potential publication led to any self-censorship.

Our analysis of Speech First's evidentiary showing does not, at this stage, speak to its success on the merits of its First Amendment claims, but to whether it has met its burden to demonstrate that any of its members experience an actual, concrete, and particularized injury as a result of the University's policies for the purpose of standing to pursue a preliminary injunction. Whereas Speech First produced a three-page, bareboned declaration from someone lacking first-hand knowledge of BART and how it operates on campus, the University put forth multiple, detailed affidavits, consistently describing BART's operations.[2] Speech First's sparse submission

---

[2] We highlight the number of University-produced affidavits, and the short-length of Neily's, to make more tangible the sharp contrast in the level of detail and supporting facts between the two submissions. We do

failed to demonstrate that any of its members face a credible threat of any enforcement on the basis of their speech or that BART's or BIP's responses to reports of bias-motivated incidents have an objective chilling effect. The district court therefore correctly determined that Speech First failed to demonstrate standing to challenge BART's and BIP's processes.

### 2. NCDs

Speech First similarly fails to demonstrate standing to seek a preliminary injunction against the University's policy of issuing NCDs. Speech First argues that its student members self-censor because they fear the University will issue NCDs in response to their speech. It contends that § 4.06(d) of the Student Disciplinary Procedures authorizes disciplinary officers to issue NCDs whenever they believe an NCD is "warranted," meaning there are no limits on when the University can issue an NCD. But § 4.06(a) explains that the disciplinary officers' authority stems from their responsibility for enforcing the Student Code, and thus cabins their ability to issue NCDs. Brown's and Die's declarations support this reading: both state that the University can only impose NCDs to enforce the Student Code and prevent violations of it, not in response to student speech.

Speech First provides one example it contends counters this conclusion—the Minik–Khan incident. But this episode does not bolster its case. The district court concluded that the University issued the NCD not "just because Minik wrote about Khan online," but because of "an extensive history of

---

not suggest that the number and length alone has any bearing on or significance to our analysis of their contents.

hostile and escalating interactions." Minik's own admissions in his email to Die—that the NCD did not prevent him from writing journalistic stories pertaining to Khan and that an NCD is not a "direct disciplinary charge"—refute any suggestion that this NCD punished Minik on the basis of his expression. This example would not lead a student to reasonably believe that speaking about controversial issues—independent of other illegitimate behavior—would result in the student receiving an NCD, as the district court explicitly found that other severe conduct, culminating in death threats, actually prompted the NCD in this instance. Nor could this example lead a student to reasonably believe that his or her protected speech would violate an NCD if the student were subject to one—Minik explicitly admitted otherwise.

Indeed, the uncontested statistics the University provided about the reasons for imposing NCDs demonstrate that the majority of NCDs arise as a result of a violation of the Student Code—which, again, does not prohibit protected speech. Others result from complaints of sexual misconduct or from an extended and intensifying conflict between students, where the University feared a future Student Code violation or violence would occur. Speech First has failed to present any example where the University issued an NCD on the basis of speech, or demonstrate that an NCD prohibits speech if imposed. And as in the BART context, Speech First has not produced any evidence that any student fears expressing a particular viewpoint due to concern the University will issue an NCD against him. Speech First therefore has failed to demonstrate a credible threat of any enforcement action to justify the students' purported self-censorship.

### B. Mootness

Lastly, we address whether Speech First's effort to enjoin the University's since-repealed (and never previously enforced) Student Code § 2-407, the prior approval rule, is moot. Article III limits federal court jurisdiction to "live cases and controversies … and 'an actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation.'" *Ozinga v. Price*, 855 F.3d 730, 734 (7th Cir. 2017) (quoting *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1975 (2016)). "A question of mootness arises when … a challenged ordinance is repealed during the pendency of litigation, and a plaintiff seeks only prospective relief." *Fed'n of Advert. Indus. Representatives, Inc. v. City of Chicago ("Federation")*, 326 F.3d 924, 929 (7th Cir. 2003). "At that point, there is no longer an ongoing controversy: the source of the plaintiff's prospective injury has been removed, and there is no 'effectual relief whatever' that the court can order." *Ozinga*, 855 F.3d at 734 (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992)). We review the question of whether an issue has been rendered moot de novo. *Federation*, 326 F.3d at 928–29.

As a general rule, in cases between private parties, "a defendant's voluntary cessation of challenged conduct will not render a case moot because the defendant remains 'free to return to his old ways.'" *Id.* at 929 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632–33 (1953)). Indeed, a case will become moot only if it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env. Serv. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). But "[w]hen the defendants are public officials … we place greater stock in their acts of self-

correction, so long as they appear genuine." *Federation*, 326 F.3d at 929 (quoting *Magnuson v. City of Hickory Hills*, 933 F.2d 562, 565 (7th Cir. 1991)); *Freedom from Religion Found., Inc. v. Concord Comty. Schs.*, 885 F.3d 1038, 1051 (7th Cir. 2018) ("A defendant's voluntary cessation of challenged conduct does not necessarily render a case moot. … But if a government actor sincerely self-corrects the practice at issue, a court will give this effort weight in its mootness determination."). A contrary conclusion would "put this court in the position of presuming [the University] has acted in bad faith—harboring hidden motives to reenact the [policy] after we have dismissed the case—something we ordinarily do not presume." *Federation*, 326 F.3d at 929. "[W]e have repeatedly held that the complete repeal of a challenged [policy] renders a case moot, unless there is evidence creating a reasonable expectation that the [University] will reenact the [policy] or one substantially similar." *Id.* at 930.

"Only in cases where there is evidence that the repeal was not genuine has the Court refused to hold the case moot." *Id.* In *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982)—a case Speech First cites—the Supreme Court held that a case was not moot despite the repeal of a challenged statute because the city had announced its intent to reenact the statute if the district court's judgment were vacated. *Id.* at 289 & n.11. Similarly, in *United States v. Sanchez-Gomez*, 138 S. Ct. 1532 (2018), the Court held a challenge to a policy was not moot because the government had represented "that the Southern District intend[ed] to reinstate its policy once it [was] no longer bound by the decision of the Courts of Appeals." *Id.* at 1537 n.*. And in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017), the governor issued a press

release on the eve of oral argument before the Supreme Court announcing a repeal of the challenged policy. *Id.* at 2019 n.1.

We conclude Speech First's challenge to Student Code § 2-407 is moot. The University is a public entity and an arm of the state government of Illinois, and therefore receives the presumption that it acts in good faith. The University repealed its policy imposing a prior restraint on posting of materials for non-campus elections after Speech First initiated this litigation. This policy is not a threat to students past, present, or future. There is no evidence in the record indicating the University ever enforced the policy. With it no longer in effect, no current student can suffer any harm from it. Furthermore, through Kirts's sworn affidavit, the University affirmatively represented to the district court and to this Court that it does not intend to reenact the provision. And the University undertook a formal amendment process, which required a full vote by the Conference on Conduct Governance and approval by the Chancellor. This process is analogous to legislation, which Speech First concedes moots an issue. Despite Speech First's assertions to the contrary, our precedent does not require notice-and-comment rulemaking or that elected officials perform the modifications.

The two cases our colleague in dissent cites make no difference to our analysis. To begin, in *Concord*, a superintendent's statement disavowing future school holiday concerts that promote religious beliefs was insufficient to moot a case where the "the school board had the authority to adopt official policies" prohibiting shows with religious purposes and "failed to document in any way its decision to make the changes permanent." 885 F.3d at 1052. The factual scenario in *Doe ex rel. Doe v. Elmbrook Sch. Dist.*, 658 F.3d 710 (7th Cir.

2011), *vacating the original panel's opinion but adopting its justiciability analysis*, 687 F.3d 840, 842 (7th Cir. 2012) (en banc), is nearly identical. Although a school's superintendent and principal had represented that they did not intend to hold the school's graduation ceremony in a church, the school failed to establish mootness because it did not adopt a policy formally prohibiting the use of churches for graduation. *Id.* at 720–21. In both cases, a mere statement was not enough—the school board needed to enact a formal policy, as was within its authority to do. Here, the University not only submitted Kirts's declaration: it formally amended the Student Code.

The Sixth Circuit in *Schlissel* applied a more stringent test to determine mootness than the one our own precedent demands: it required not only a formal process to repeal a policy but affirmative signals from the University that the repeal was genuine. The Sixth Circuit held that Speech First's challenge to definitions of "bullying" and "harassing" was not moot, even though the University of Michigan modified these definitions after Speech First filed suit. 939 F.3d at 770. The Sixth Circuit noted, "Where regulatory changes are effected through formal, legislative-like procedures, we have found that to moot the case the government need not do much more than simply represent that it would not return to the challenged policies." *Id.* at 768. The court took issue with the fact that the University of Michigan did not "affirmatively state[] that it does not intend to reenact the challenged definitions." *Id.* at 769. The University of Illinois made exactly this assertion, and Speech First has not rebutted it.

Moreover, in *Schlissel,* the University of Michigan actively applied these definitions, promoted them on the website of its Office of Student Conflict Resolution, and continued to

defend the constitutionality of the definitions in the litigation. *Id.* at 762, 770. These factors contributed to the court's conclusion that the University's modification of the definitions did not moot Speech First's claim. *Id.* at 770. Here, there is no evidence that the University of Illinois ever enforced the now-repealed § 2-407 in the first place, and the University has at no point ever defended its constitutionality. Even under the Sixth Circuit's more demanding standard, Speech First's claim regarding § 2-407 is moot.

Indeed, the dissent's mootness analysis would create a standard going beyond that of even the Sixth Circuit in *Schlissel*, as it adds several requirements that draw no support from Supreme Court or our own precedent. We have never demanded, nor did the Sixth Circuit require, a concession that a rule is unconstitutional. In addition, while the Sixth Circuit did find relevant the lack of an affirmative statement that the university did "not intend to reenact the challenged" policy, it did not require a binding promise that the university will never revisit it. *Id.* at 769. We similarly have never required a government actor to issue a promise that it will not return to its prior policy. And while the dissent takes issue with the fact that the University here could repeal the policy in four days' times, we are unaware of any precedent suggesting that the amount of time it takes to perform a repeal has any bearing on the mootness analysis. What the dissent appears to hang its hat on—the merely theoretical possibility that the University could decide to revisit the policy at some remote point in

the future without any evidence of an intention to do so—is not enough to survive a mootness challenge.[3]

### III. Conclusion

Speech First lacks standing to seek a preliminary injunction against the University's BART, BIP, and NCD policies, and its challenge to Student Code § 2-407 is moot. The judgment of the district court is AFFIRMED.

---

[3] The dissent also takes issue with the timing of the repeal, which came after the commencement of this litigation. Indeed, the Sixth Circuit in *Schlissel* also found that factor relevant to its analysis. But in that case, the university actively used the challenged definitions and there was thus "no indication … that the University was so much as *considering* changing the definitions" before it did so. 939 F.3d at 769. Here, where there is no evidence the provision was ever enforced or that the University was even aware it was on the books, timing is not so suspect.

BRENNAN, *Circuit Judge*, concurring in part and dissenting in part. For several years universities have engaged in heightened efforts to supervise speech on their campuses. These steps can collide with the First Amendment's free speech protections, especially of political speech. At issue in this case are the University of Illinois's policies to monitor speech on campus and in residence halls, as well as the prohibition in its Student Code on distributing election literature on campus.

I concur with the majority opinion that, on this record, Speech First offered insufficient evidence of injury in fact to qualify for associational standing. I do not conclude that the challenge to the Student Code prohibiting the disbursement of campaign literature is moot and respectfully dissent on that question.

## I. Standing to Challenge Bias Responses and No Contact Directives

### A. Legal Framework

Associational standing, which Speech First asserts, is a function of that association's individual members' standing. *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (recognizing an association has standing to sue on behalf of its members when members would otherwise have standing to sue in their own right). To establish constitutional standing under Article III, at least one association member must show an "injury in fact." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016); *United Food & Commercial Workers Union v. Brown Group*, 517 U.S. 544, 555 (1996); *Lujan v. Defenders of*

*Wildlife*, 504 U.S. 555, 560 (1992). Whether Speech First's members satisfy the injury-in-fact standard is one of the justiciability disputes in this case.[1]

"Injury in fact" means an invasion of a legally protected interest that is concrete and particularized, and actual or imminent, rather than conjectural or hypothetical. *Lujan*, 504 U.S. at 560. In *Spokeo* the Supreme Court explained in detail the particularization and concreteness requirements. "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" 136 S. Ct. at 1548 (quoting *Lujan*, 112 S.Ct. at 2136 n.1). Concreteness requires an injury be "*de facto*"; "that is, it must actually exist." *Id*. "[I]ntangible injuries can nevertheless be concrete." *Id*. (citations to First Amendment challenges omitted). The Court has "made it clear time and again that an injury in fact must be both concrete *and* particularized." *Id*. (citing *inter alia Susan B. Anthony List v. Driehaus (SBA List)*, 573 U.S. 149, 158 (2014)).

Finer points are introduced when a plaintiff tests a law or rule under the First Amendment. A facial challenge can be pre-enforcement. *Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *see also Brandt v. Vill. of Winnetka, Ill.*, 612 F.3d 647, 649 (7th Cir. 2010). Without an enforcement action, what a plaintiff must show to satisfy the injury-in-fact requirement for a First Amendment claim has been described somewhat differently by different courts.

---

[1] Not disputed are the other two elements of standing, a "causal connection between the injury and the conduct complained of," meaning that the injury is "fairly traceable" to the defendant's actions, and a likelihood that the injury "will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61.

As the majority opinion points out, to establish injury in fact, a plaintiff must make one of two showings. The first requires an intention to engage in a course of conduct arguably affected with a constitutional interest but which is proscribed by a policy, and a credible threat the policy will be enforced against the plaintiff. *SBA List*, 573 U.S. at 158–59; *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (requiring "a credible threat of prosecution"). Under the second, a plaintiff must show a chilling effect on speech that is objectively reasonable, and the plaintiff self-censors as a result. *Bell v. Keating*, 697 F.3d 445, 454 (7th Cir. 2012).

This court has elaborated on these showings in deciding other pre-enforcement facial First Amendment challenges. In *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464 (7th Cir. 2012), a nonprofit organization (like Speech First) brought a pre-enforcement challenge to Illinois's campaign finance disclosure requirements, contending they were constitutionally violative as vague and overbroad. This court's evaluation centered on chilling effect. It noted that "[t]he injury-in-fact standard is often satisfied in pre-enforcement challenges to limitations on speech," and recognized the harm of self-censorship without prosecution. *Madigan*, 697 F.3d at 473–74 (citing *Virginia v. Am. Booksellers Ass'n (American Booksellers)*, 484 U.S. 383 (1988)). "The chilling of protected speech may thus alone qualify as a cognizable Article III injury, provided the plaintiffs 'have alleged an actual and well-founded fear that the law will be enforced against them.'" *Id*. at 474 (quoting *American Booksellers*, 484 U.S. at 393).

In *Bell*, an opinion decided the same day as *Madigan*, this court analyzed a pre-enforcement facial challenge that a fail-

ure-to-disperse provision in Chicago's disorderly conduct or-
dinance was vague and overbroad. Chilled speech was recog-
nized as an injury that can support standing, but a plaintiff's
subjective fear of chilling was insufficient to sustain a court's
Article III jurisdiction over such a claim. *Id.* at 453. "The plain-
tiff must substantiate a concrete and particularized chilling ef-
fect on his protected speech or expressive conduct to pursue
prospective relief." *Id.* at 454 (concluding the plaintiff had suc-
cessfully alleged a chilling injury and enjoyed standing to sue
for injunctive relief and to facially challenge the ordinance).

Below I consider this case under this framework.

**B. Discussion**

Speech First bears the burden to show standing as the
party invoking federal jurisdiction. *Lujan*, 504 U.S. at 561. The
evidence must be presented, as the majority opinion states, by
affidavit or other evidence of specific facts rather than general
allegations of injury. *Six Star Holdings, LLC v. City of Milwau-
kee*, 821 F.3d 795, 801–02 (7th Cir. 2016).

The majority opinion organizes its standing analysis
around a series of factual findings by the district court, con-
cluding that none are clearly erroneous and that Speech First
has not submitted evidence disputing many of them. I concur
with my colleagues' review of some of these findings. Other
findings—such as a report to the bias assessment response
team having no consequences, the voluntariness of a meeting
with the bias assessment response team not chilling speech,
and the privacy of students' interactions with the bias assess-
ment response team—I see as closer calls, and their resolution

a function of the sparse evidence Speech First presented. Because there was no evidentiary hearing,[2] those specific facts must be set forth by affidavit.

How specific the facts must be in this context has been set by the Supreme Court. In *Laird v. Tatum*, 408 U.S. 1 (1972), plaintiffs challenged the U.S. Army's surveillance of civilian political activity as chilling their exercise of First Amendment rights. Affidavits on the plaintiffs' motion for a preliminary injunction gave background information and described the complained-of activities. *Id*. at 3. The Court ruled that the mere existence and operation of a government system was insufficient to present a justiciable controversy. *Id*. at 10–14.

In *Laird* the plaintiffs complained about "the mere existence … of a governmental investigative and data-gathering activity," and nothing more. *Id*. at 10. The Court held that the plaintiffs (the subjects of the surveillance) may have suffered a "subjective chill," but did not allege "actual present or immediately threatened injury" to entitle them to standing. *Id*. at 15. "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm" by the plaintiffs. *Id*. at 13–14. The plaintiffs must be "presently or prospectively subject to the regulations, proscriptions, or compulsions" being challenged, *id*. at 11, a threshold they did not meet. While governmental action with only an indirect effect on First Amendment rights may be subject to constitutional challenge, plaintiffs seeking to invoke the judicial power must show that

---

[2] A hearing was set on the motion for preliminary injunction on September 23, 2019, but the district court issued its Order denying the motion six days before.

they sustained, or are in immediate danger of sustaining, a direct injury as a result of that action. *Id.* at 12–13 (citing *Ex parte Levitt*, 302 U.S. 633, 634 (1937)); *see also Socialist Workers Party v. Att'y Gen. of U.S.*, 419 U.S. 1314, 1319 (1974) (Marshall, J., sitting as Circuit Justice) (concluding "specificity of the injury claimed by the applicants is sufficient, under *Laird*, to satisfy the requirements of Art. III.").

The obverse circumstances were presented in *Meese v. Keene*, 481 U.S. 465 (1987). There a plaintiff wished to exhibit films about nuclear war and acid rain, and he challenged a federal statute that required those films to be labeled "political propaganda." *Id.* at 467. The plaintiff submitted detailed and uncontradicted affidavits that he would be substantially harmed, his reputation would be adversely affected, and he risked injury as a result of the films being classified as propaganda, so the Court concluded he had standing to sue. *Id*. at 472–74. If the plaintiff "had merely alleged that the appellation deterred him by exercising a chilling effect on the exercise of his First Amendment rights, he would not have standing to seek its invalidation." *Id*. at 473 (citing *Laird*, 408 U.S. at 13-14).

Applying these standards here leads me to conclude that the statements in the Neily declaration lack the required specificity—including the particularity and concreteness—to meet this evidentiary threshold. Although the majority opinion cites to the number and length of the University's affidavits, critical to me are the facts (or lack thereof) attested to on the topics of self-censoring, referrals for punishment or discipline, identification/anonymity, no-contact directives, and the bias incident protocol.

*Self-censorship*. The Neily declaration states that students A–D credibly fear the University's bias assessment response

initiative and its consequences, and that the only way for them to avoid it is to engage in self-censorship. But those two conclusory sentences in that declaration offer no evidence of any of these students self-censoring their speech to avoid the initiatives. For example, the students did not file anonymous affidavits setting forth what they would have said, when, where, and to whom. As explained in *Laird*, students A–D cannot merely object to the existence and operation of a system; they must show a specific present objective harm or threat of specific harm. 408 U.S. at 11. Rather than the detailed and unrebutted affidavits the plaintiff submitted in *Meese*, the students here averred a subjective chill without more.

Yet even if students A–D had sufficiently established an objectively reasonable fear, under *Bell* they must substantiate a concrete and particularized chilling effect. We know more about what that means after *Spokeo*: "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way." 136 S. Ct. at 1548. "A 'concrete' injury must be 'de facto'; that is, it must actually exist." *Id*. (citation omitted). Here, no evidence has been presented of such effects on students A–D. To show that injuries "actually existed" plaintiffs must assert more than a mere conclusion that their speech has been chilled.

*Referrals for Punishment or Discipline*. The Neily declaration does not aver that any of the four students listed have been punished or disciplined, or threatened with punishment or discipline, and the record does not reveal any students being investigated or punished as a result of the two challenged University policies. The declaration does include an example of an advisor commenting to a student about a bias complaint against that student, but it does not connect that averment

with students A–D, again failing the particularity and con-
creteness requirements.

In contrast are the more specific declarations from January
Boten, Assistant Dean of Students in the Office for Student
Conflict Resolution, and Justin Brown, Associate Dean of Stu-
dents and Director of the Office for Student Conflict Resolu-
tion. They describe how the bias assessment response team
does not make referrals to the police or the student discipli-
nary process unless the speech or conduct also violates the
Student Code.

*Identification/Anonymity*. Four students in the Neily decla-
ration listed topics about which they wish to speak, advocate,
and ask questions: students A and C on immigration, student
B on Islamic policy, and student D on LGBT issues. Each year,
the bias assessment response team issues a report describing
the complaints it received and its responses. The year-end re-
port includes these topics, but according to the University the
report does not identify these (or other) students as having
been approached to discuss alleged bias incidents or being
given corrective actions.

Speech First argues that the detailed descriptions in the
bias assessment response team report make some of the "of-
fenders" (the term used in the University's policies) easily
identifiable, and that students could fear inclusion in the re-
port. Along with the descriptions in the majority opinion, ex-
amples of reported bias include a campus speaker "saying
things like 'America is the greatest country in the world,'"
sidewalk chalk advocating "Women For Trump," and an in-
structor "fail[ing] to use [a student's] preferred gender pro-
nouns and ma[king] statements about gender identity being a
matter of choice." To Speech First, the person charged with

bias can easily be traced by comparing the bias report with a calendar and news reports, making chilling effects more likely.

But the example Speech First cites—complaints received and the University response to an event on immigration—is absent from the Neily declaration. And there is no evidentiary connection between students A–D and the year-end report. Nor is there evidence as to the consequences for a student's inclusion in the report. Absent such information, the declaration does not show that these four Speech First members have an objectively reasonable, actual, and well-founded fear that they will be identified, or that their anonymity will be compromised, by the year-end report.

*No-Contact Directives*. The Neily declaration presents no evidence that the University issued a no contact order against students A–D or issued such an order on the topics these students would like to discuss.

*Bias Incident Protocol*. As the majority opinion points out, the Neily declaration does not mention the bias incident protocol, which is the bias assessment reporting initiative applicable in University student housing. The three words "in their dormitories" included in the Neily declaration does not establish standing to challenge that procedure, even if it is similar in nature to the bias assessment response team.

From the absence of specific facts attested to on these five topics, I conclude that under the legal framework discussed above, Speech First has not met its burden to establish standing. The evidence presented at this stage does not support the conclusion that students A–D had actual and well-founded fears that the University policies will be enforced against

them, and that those four students have had a concrete and particularized chilling effect on their protected speech, despite the modest evidentiary threshold.

This conclusion—given the legal subject matter, the policies in dispute, and the arguments offered—is not uncomplicated. Speech First contends in its briefs that the University's bias assessment response policies chill students' speech. The topics about which students A–D wish to speak, unfettered, show their desire to engage in political speech.[3] Reasonably risk-averse students generally avoid a burdensome investigative process. Such investigations could amplify reputational damage suffered by "offenders" even when the speech investigated is protected.

The University also labels its students "offenders" on unverified accusations alone. Nobody likes to be called an "offender," which bears with it some reputational damage. *See, e.g.*, *Meese*, 481 U.S. at 473 (plaintiff submitted detailed affidavits, including the results of an opinion poll, that his exhibition of films classified as political propaganda would adversely affect his reputation). Because reputational damage can impair a student's prospects for academic and professional success, objectively reasonable students may be expected to behave in ways that mitigate their exposure to any allegation that might trigger a bias investigation. "Process is punishment" is not a platitude; a University-controlled clearinghouse for speech can deter students from speaking out.

---

[3] *See, e.g.*, Brief of *Amicus Curiae* Southeastern Legal Foundation in Support of Plaintiff-Appellant and Reversal, pp. 1-5, ECF No. 18.

No educational institution should force students to balance academic and professional success against the free expression of political viewpoints. Potential "offenders" may not speak at all if they fear that University officials are monitoring them for biased speech.[4] The practical effect of the bias assessment initiatives could be to communicate that open discussion should cease if it interferes with any listener's subjective beliefs.

While such consequences could conceivably constitute particular and concrete threats of harm chilling protected speech, none of this appears in the Neily declaration involving students A–D. Some of Speech First's points and arguments are included in their briefs, but not in the evidence. For example, the dispute and subsequent no-contact directive between Khan and Minik is argued in the briefs, but absent from the evidentiary record. The bar is not being set too high here, as specific facts in affidavits are essential.[5]

This conclusion is also difficult to reconcile with the Sixth Circuit panel majority opinion in *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 765 (6th Cir. 2019), which held that Speech First had standing to challenge the University of Michigan's bias response team initiative.[6] The Neily declaration in *Schlissel* resembles her declaration here, and the district court in this case

---

[4] *See, e.g.*, Amicus Brief of the Wisconsin Institute for Law & Liberty Supporting Appellant and Reversal, pp. 6–10, ECF No. 25.

[5] Nor could the district court consider examples from the complaint which was not verified.

[6] Another pending case challenges the University of Texas's bias assessment response team initiatives. *Speech First, Inc. v. Fenves*, 384 F. Supp. 3d 732, 735 (W.D. Tex. 2019) (denying motion for preliminary injunction,

noted that the University of Michigan and the University of Illinois have "similar university bias response policies." Still, on this record, Speech First has not met the standing requirements for this First Amendment pre-enforcement challenge for the reasons discussed above.

"[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). Before a court may exercise its authority to limit government power, the justiciability rules and requirements must be followed. As the Court stated in *Spokeo*, Article III standing "serves to … confine[] the federal courts to a properly judicial role." 136 S. Ct. at 1547 (internal quotation marks and citations omitted). Standing requirements demarcate non-justiciable abstract questions from cases or controversies properly subject to adjudication. These requirements play a functional role in maintaining our separation of powers. *See* Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 SUFFOLK UNIV. L. REV. 881, 894-97 (1983). At this stage of this litigation specific facts establishing standing have not been presented.

## II. Mootness of Prior Approval Rule

Student Code § 2-407 prohibited, without prior approval, the posting and distribution of handout materials that promoted candidates for non-campus elections. Students who violated the provision were subject to discipline.

---

and finding Speech First's students members lack standing), appeal to 5th Cir. June 7, 2019 (No. 19-50529), case argued March 2, 2020.

Speech First challenges this prohibition as an impermissible prior restraint on political speech violating the First Amendment. Its complaint alleges the University published no criteria governing what materials merited approval or when it would rule on an application to post or distribute such election materials. Without the University having shown a compelling interest in a prior restraint of political speech, and this prohibition being narrowly tailored to such an interest, Speech First challenges this code provision as chilling protected speech and forcing students who do not wish to comply with this requirement to engage in self-censorship.

Seven weeks after this lawsuit was filed—and four days before the University responded to the preliminary injunction motion—the University amended the Student Code to repeal the prior approval rule, as described in the majority opinion. The University's Associate Dean of Students, Rhonda Kirts, filed a declaration stating "[t]he University has no intention of restoring the eliminated provision or adopting a new provision similar to it, and therefore this elimination of the pre-approval requirement for non-campus election materials is definitive." The University argues Speech First's challenge to this student code provision is therefore moot. Speech First disagrees. We review this question de novo. *Federation of Advert. Indus. Reps., Inc. v. City of Chicago*, 326 F.3d 924, 928-29 (7th Cir. 2003).

"Voluntary cessation of the contested conduct makes litigation moot only if it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.' Otherwise the defendant could resume the challenged conduct as soon as the suit was dismissed." *Elim Romanian Pentecostal Church, et al. v. Jay Robert Pritzker*, 962 F.3d 341, 345

(7th Cir. 2020) (quoting *Friends of the Earth, Inc. v. Laidlaw Env. Serv. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). "The party asserting mootness bears a 'heavy burden' of persuading the court that there is no reasonable expectation that the challenged conduct will reappear in the future." *Pleasureland Museum, Inc. v. Beutter*, 288 F.3d 988, 999 (7th Cir. 2002) (quoting *Friends of the Earth*, 528 U.S. at 189).

The relative ease, timing, and manner by which the University amended the Student Code are all measures as to whether it meets this heavy burden. On none of these criteria has the University shown with absolute clarity that the prior approval rule has perished permanently.

It took only four days for the University's conduct conference to repeal the challenged provision and for the chancellor to approve, moves that had an immediate effect. Such a repeal could be undone in the same time frame with the same ease. Because the University's procedures are self-imposed, it remains unconstrained to reverse itself on the prior approval requirement. Indeed, the Student Code says it is "subject to change without notice," and the code provides ways it can be amended differently than as amended here. The University has taken the position that the policies challenged in this case are "critical to the University's functioning and achievement of its educational mission." If that includes the prior approval code provision, such a continued position does not indicate permanent abandonment. *See, e.g., Jager v. Douglas Cty. Sch. Dist.*, 862 F.2d 824, 833–34 (11th Cir.), *cert. denied*, 490 U.S. 1090 (1989) (holding voluntary cessation of pregame prayer did not moot First Amendment challenge where elimination was not formal board policy). My colleagues in the majority conclude that the repeal and possibility of reenactment in such a short

time frame is of no moment, but this court has considered the ease with which a contested government action has been repealed and can be replaced, *see, e.g.*, *Federation of Advertising Injury Representatives, Inc.*, 482 F.3d at 931 (considering municipality's pattern of proposed and repealed ordinances, although concluding case was moot), as have other appellate courts. *See Rosebrock v. Mathis*, 745 F.3d 963, 972 (9th Cir. 2014) (considering whether policy change "could be easily abandoned or altered in the future") (quoting *Bell v. City of Boise*, 709 F.3d 890, 901 (9th Cir. 2013)).

When the University amended the Student Code also must be considered. The prior approval rule was withdrawn nearly two months into this litigation, and just before the University responded to the crucial preliminary injunction motion. My colleagues in the majority do not find this timing suspect. Yet a reasonable inference from when this repeal occurred is that the University decided the prior approval rule was constitutionally violative, so it was deleted from the Student Code. A concession in the University's declarations that the prior approval rule is an impermissible prior restraint on political speech would evince that the University would not reenact it, as the admission in litigation of a constitutional violation is unlikely to be reconsidered. *See Wis. Right to Life v. Schober*, 366 F.3d 485, 487-88 (7th Cir. 2004) (recognizing voluntary cessation rendered case moot because state agency admitted challenged statute was unconstitutional). But the University makes no such admission. [7]

---

[7] In the district court the parties agreed to stay the defendants' obligation to answer or otherwise respond to the complaint, so the defendants

How the University voluntarily discontinued the challenged official action matters as well. Kirts declares the University "has no intention" to reverse field, a stance she characterizes as "definitive." But more than a non-committal statement is required to persuade that the challenged provision will not resurface. *See, e.g., People for the Ethical Treatment of Animals v. United States Dep't of Agriculture and Animal and Plant Health Insp. Serv.*, 918 F.3d 151, 157-159 (D.C. Cir. 2019) (governmental department's statement of intent to change lacked necessary precision to conclude that its voluntary cessation mooted the case). Neither Kirts nor the other University declarants promise that the University will not revisit this Student Code provision. Even if she did, the Kirts declaration does not bind the University. It reflects an intent arrived at weeks after this litigation ensued, and in the face of the preliminary injunction motion. The Supreme Court used the adverb "absolutely" to modify how clear it must be that the allegedly wrongful behavior could not be expected to recur. *Friends of the Earth, Inc.*, 528 U.S. at 189. The University's declarations fail to meet that heavy burden.

The University contends § 2-407 will not be reinstated because it has never been enforced. Besides falling prey to the gambler's fallacy (an inference about unknown future events based upon known past events), the only evidence of the prior approval rule's history of enforcement is a single sentence in Kirts's declaration, which is limited to her personal experience, not that of the entire University. The majority opinion's

---

have not responded to this claim other than in response to the preliminary injunction motion.

repeated statement that this provision has never been enforced misses the mark for the same reason. As the Sixth Circuit pointed out in *Speech First, Inc. v. Schlissel*, 939 F.3d at 766, "[t]he lack of discipline against students could just as well indicate that speech has already been chilled."

While the majority opinion is correct that "[c]ourts are more apt to trust public officials than private defendants to desist from future violations … [t]he tendency to trust public officials is not complete, however, nor is it invoked automatically." 13C CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 3533.7 (3d ed. 2008). The manner in which an entity, public or private, voluntarily ceases is important. *Speech First, Inc. v. Schlissel*, 939 F.3d at 768 (taking into account "the totality of the circumstances surrounding the voluntary cessation, including the manner in which the cessation was executed."). The discontinued official action here—the Student Code provision—was not repealed by a legislature revising a state statute, *see Matter of Bunker Ltd. Partnership*, 820 F.2d 308, 312–13 (9th Cir. 1987), or after compliance with a court order, *see Spirit of the Sage Council v. Norton*, 411 F.3d 225, 229–30 (D.C. Cir. 2005). It was not even a repealed municipal ordinance. *See Federation*, 326 F.3d at 927; *Pleasureland*, 288 F.3d at 993. Instead, it was a provision in the University's Student Code, defined as "a collection of rules, regulations, policies, and procedures that apply to, or otherwise directly impact, students at the University of Illinois at Urbana-Champaign." Albeit on a greater scale, such a Student Code is in common with the decisions of a school board.

In that important respect, the mootness analysis of this court in two cases involving school districts provides some

good guidance. First, in *Freedom from Religion Found., Inc. v. Concord Comm. Sch.*, 885 F.3d 1038 (7th Cir. 2018), this court concluded that a school superintendent's statements in an affidavit—that the school district would present an annual holiday program compliant with the First Amendment's Establishment Clause—did not render moot claims challenging that program. *Id*. at 1050–53. That the superintendent was sincere was not enough to conclude the dispute was moot, as there was "no guarantee that a future superintendent would take the same stance." *Id*. at 1052 (citing *Boyd v. Adams*, 513 F.2d 83, 89 (7th Cir. 1975) (new decision-maker could "resurrect the old procedure in the future")). In *Concord* this court contrasted the superintendent's affidavit in that case with the voluntary cessation in *Wis. Right to Life, Inc. v. Schober*, 366 F.3d at 487–88, 492. In *Schober*, a state agency sent a letter to the plaintiff stating that it would not enforce the challenged statute against plaintiff because it considered the statute to be unconstitutional; the state agency also posted online that the challenged statute was unconstitutional.

As the superintendent's affidavit in *Concord* fell short of the commitments in *Schober*, so Kirts's declaration falls short here. Had the University admitted the unconstitutionality of the provision and promised not to enforce it, like in *Schober*, it would have come closer to bearing its heavy burden. On the record before us, though, the University's failure "to document in any way its decision to make the change permanent" is enough to present a live controversy. *Concord*, 885 F.3d at 1052.

Second, in *Doe ex rel. Doe v. Elmbrook Sch. Dist.*, 658 F.3d 710 (7th Cir. 2011), *vacated on grounds other than justiciability*, 687 F.3d 840, 842 (7th Cir. 2012) (en banc), this court held that

a school district had failed to establish mootness because it did not adopt a formal policy prohibiting the use of churches for graduation. 658 F.3d at 720–21. The school district, therefore, had not met its burden of demonstrating with absolute clarity that it would not engage in First Amendment violative conduct. *Id*. The University's failure to adopt a similar forward-looking, binding, and formal policy position should lead us to the same conclusion that the challenge to the prior approval rule is not moot.[8]

Even a state governor's announcement of voluntary cessation has been deemed insufficient to meet the heavy burden to moot a case. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017). That case involved a challenge to a Missouri agency's policy of disqualifying religious organizations from grant funding. Though the governor had announced he had directed to the contrary, nothing prevented the state agency from reinstating its former policy, so the Supreme Court declined to find the controversy moot. *Id*. at 2019 n.1. Kirts's non-binding statement as a school administrator has less weight than a governor's statement. A tougher case would be if the University's governing body which exercises final authority—its board of trustees—issued some type of

---

[8] My colleagues in the majority conclude that these cases are distinguishable because these school boards made statements without adopting a formal policy, while the University amended its Student Code. But such an amendment does not address reversibility or the other important considerations of how an entity voluntarily ceases challenged conduct. Deleting a provision after litigation ensues is far weaker than longer-lasting constraints such as a concession of unconstitutionality or a binding promise.

binding statute (formerly called bylaws), rendering permanent the repeal of the prior approval rule, but that did not happen here.

The majority opinion states that the Sixth Circuit in *Schlissel* applied a "more demanding standard" than our court, requiring not only a formal process to repeal but affirmative signals from the University that the repeal was genuine, which the majority opinion finds in Kirts's declaration. In my view, the mootness analysis in *Schlissel* is highly similar to our evaluation here, as should be the result. The Sixth Circuit concluded that the University of Michigan's ad hoc regulatory processes leading to changed definitions in its Student Code did not relieve the school of much of its reduced burden as a government entity to show the case is moot. *Schlissel*, 939 F.3d at 769. The timing of the University's repeal—removing the definition after the complaint in the case was filed—raised suspicions that its cessation was not genuine. *Id*. Those same concerns are present here. The panel majority in *Schlissel* concluded that the claim challenging the definitions in the University of Michigan's student code was not moot. *Id*. at 770. For the same reasons, the mootness analysis I apply properly employs the standards of "heavy burden" and "absolutely clear," which come directly from the Supreme Court in *Friends of the Earth, Inc.*, 528 U.S. at 189.

The circumstances of this case do not persuade me that the University has, as the law requires, carried its heavy burden to make it absolutely clear that the allegedly offending Student Code provision will not return. So I respectfully dissent from the conclusion that Speech First's challenge of the prior approval rule is moot.

### III. Conclusion

This case had a short life in the district court—from filing to order in less than four months, followed by this interlocutory appeal. And the evidentiary support submitted in that abbreviated period falls short, to the detriment of both sides.

I agree that, under the applicable law, the Neily declaration presents insufficient evidence of injury in fact, so associational standing has not been established, and the district court's denial of the plaintiff's motion for a preliminary injunction must be affirmed. In the Kirts declaration, the University did not bear its heavy burden to make it absolutely clear that the prior approval rule will not reasonably be expected to be reinstated, so I conclude Speech First's challenge of that provision is not moot.

This case has been stayed in the district court pending this appeal. On remand, the district court can consider under the applicable rules and based on the parties' arguments whether to allow amendment to the pleadings and discovery to develop the evidentiary record for the remainder of this case.[9]

---

[9] The Sixth Circuit noted the same in *Schlissel*, 939 F.3d at 765 n.1.